THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EDWARD McCANN, Plaintiff in Error.

*Opinion filed October 28, 1910—Rehearing denied Dec. 7, 1910.*

1. OFFICES—*office must be filled in manner prescribed by statute.* A city council may, by ordinance, create a municipal office, but the office, when created, must be filled by the authority and in the manner prescribed by statute.

2. SAME—*the power to appoint to city office is vested in mayor.* The power to fill offices established by ordinance is vested by statute in the mayor with the approval of the city council, and this power cannot lawfully be delegated to another officer.

3. SAME—*a de facto officer cannot deny responsibility for his acts.* One who is seeking to establish some right depending upon a valid title to office must show that he is an officer *de jure;* but if the office has a legal existence, one who assumes the duties thereof and discharges its powers and functions becomes a *de facto* officer, and will not be permitted to deny responsibility for his acts upon the ground that he was not legally elected or appointed.

4. SAME—*office of police inspector of Chicago is legally created by ordinance.* By the provision of the Chicago ordinance establishing a department of police, which shall embrace, among other officers, "one inspector of police for each police division," the office of police inspector was legally established; but the manner of filling such office by appointment by the general superintendent of police instead of the mayor, as provided therein, is illegal.

5. CRIMINAL LAW—*when People need not show that defendant was a de jure officer.* Where an indictment charging a police inspector with the crime of bribery shows that there was a *de jure* office and that the defendant assumed to occupy such office and exercise its powers and functions, it is not necessary for the People to allege and prove that he was a *de jure* officer.

6. SAME—*motion to quash is properly overruled if there is one good count.* If there is one good count which is sufficient to support the judgment, it is proper to overrule a motion to quash the indictment even though the other counts are defective.

7. BRIBERY—*municipal officers are within section 31 of Criminal Code.* Section 8 of article 6 of the Cities and Villages act, which repealed, by implication, the amendment of 1872 relating to bribery of municipal officers, was in turn superseded by section 31 of the Criminal Code as amended in 1874, so that bribery of mu-

nicipal officers is now the subject of indictment and prosecution under said section 31.

8. SAME—*when police inspector is guilty of crime of bribery.* A police inspector who receives money collected, at his direction, from keepers of houses of assignation and ill-fame for the purpose of allowing such houses, which it was his duty to close, to be kept open in violation of law, is guilty of the crime of bribery.

9. SAME—*what is not a fatal variance between indictment and proof.* That the indictment charges defendant with receiving a bribe from a named person to allow certain houses of ill-fame to be maintained without police interference, whereas the proof shows that the person named as giving the bribe first collected the money, at defendant's request, from the persons maintaining the houses, is not such a variance as precludes a conviction for bribery.

10. SAME—*admissibility of canceled checks not payable to defendant.* Where a witness in a bribery prosecution testifies that he received checks from a certain person, cashed them and paid the money to the defendant, the canceled checks are admissible in evidence as tending to corroborate the statement of the witness as to where he got the money, even though there is nothing on the checks connecting the defendant with them.

11. SAME—*what evidence is competent in bribery prosecution.* Where a witness testifies that he was directed by the defendant to tell the keepers of houses of assignation and ill-fame certain things when he went to them to collect money to be paid to the defendant to protect them from police interference, it is not error to allow him to tell what he said to such persons in carrying out defendant's instructions.

12. TRIAL—*State's attorney should not violate rule forbidding argument of matters outside the record.* The State's attorney owes a duty to the defendant as well as to the People, and the fact that counsel for the defendant go outside of the record in their argument to the jury, and in various ways are guilty of improper conduct, furnishes no justification to the State's attorney for resorting to similar tactics.

13. APPEALS AND ERRORS—*when improper conduct of State's attorney will not reverse.* Improper remarks and conduct by the State's attorney in his argument to the jury are to be condemned in every case, but they will not be held to be ground for reversal except where the evidence for the prosecution is such that the court is of the opinion they contributed to produce the verdict.

14. SAME—*when judgment of conviction will not be reversed on the evidence.* Where the proof for the People is amply sufficient to warrant the judgment of conviction, its mere contradiction

by the proof of the defendant will not warrant a reversal, unless a consideration of all the evidence produces the conviction that the guilt of the defendant is improbable or reasonably doubtful.

15. SAME—*fact that chief witnesses for the People are not exemplary citizens does not require reversal.* The fact that the chief witnesses for the People in a bribery prosecution were not exemplary citizens does not warrant the discrediting of their testimony though contradicted by the defendant, and is not, of itself, ground for reversing a judgment approving the verdict of the jury, whose province is to determine the truth of conflicting testimony.

COOKE, J., dissenting.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. A. C. BARNES, Judge, presiding.

Edward McCann, plaintiff in error, inspector of police of the city of Chicago, was indicted by the grand jury of Cook county for the crime of bribery. He was tried, convicted and sentenced to an indeterminate term in the penitentiary, and has brought the case here by writ of error for review.

The first count of the indictment charges McCann was an executive officer, to-wit, an inspector of police of the city of Chicago, an incorporated city, legally appointed, confirmed, qualified and sworn to discharge the duties of that office; that contriving and intending to violate and betray the powers and duties of his said office and the trust and confidence reposed in him, and contriving and intending the powers and duties of his said office to discharge and perform with partiality and favor and contrary to law, he then and there, with the intent aforesaid, unlawfully, knowingly, corruptly and feloniously did accept and receive from Louis Frank $475 in money as a bribe and pecuniary reward offered and given by the said Louis Frank, and taken, accepted and received by said Edward McCann with the intent and purpose to induce him, the said Edward McCann, to permit, authorize and allow certain keepers of certain houses of ill-fame and places for

the practice of prostitution, to-wit, Harry Hoffman and several others named in the indictment, to keep, use and occupy buildings and rooms for the purpose of and devoted to the practice of prostitution and lewdness and to the encouragement of idleness, gaming, drinking, fornication and other misbehaviors in the corporate limits of said city of Chicago, and to induce and influence him, the said Edward McCann, not to arrest or cause to be arrested the keepers of said houses of ill-fame and places for the practice of prostitution, and to keep and protect them from arrest and punishment and from municipal or police molestation or interference while engaged in keeping, using and occupying buildings and rooms for the purpose of practicing prostitution and lewdness and the encouragement of idleness, gaming, drinking and fornication.

The second count is in all respects like the first, except that it charges McCann was "an officer" instead of "an executive officer," as alleged in the first count.

The third count charges McCann was a member of the police force in and for the city of Chicago, to-wit, an inspector of said police force, and that he unlawfully, feloniously and corruptly, and contrary to his duty as such inspector and member of the police force, did receive and accept as a bribe from Louis Frank $475 lawful money to induce him, said McCann, as such inspector and member of the police force, to refrain from arresting and prosecuting numerous persons named in said indictment for a violation of the laws of the State of Illinois then before committed by them, to-wit, the violation of said laws relating to keeping and maintaining houses of ill-fame and places for the practice of prostitution, it being then and there the duty of said Edward McCann, as inspector and member of the police force aforesaid, to enforce said laws.

The fourth count is substantially the same as the third, except that it alleges Edward McCann, a member of the police force, accepted a bribe of $475 from Louis Frank

for the purpose of inducing him, said McCann, to permit the same persons named in the other counts to continuously violate the laws of the State of Illinois relating to keeping houses of ill-fame and places for the practice of prostitution.

The fifth count is as follows: "The grand jurors aforesaid, chosen, selected and sworn in and for the county of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oaths aforesaid do further present that one Edward McCann, late of the county of Cook, on the first day of July, in the year of our Lord one thousand nine hundred and nine, in said county of Cook, in the State of Illinois aforesaid, was a member of the police force, and an inspector thereof, of the city of Chicago, an incorporated city there situate, the said Edward McCann being then and there duly appointed, qualified and acting as such inspector and member of the police force of said city of Chicago; that the said Edward McCann theretofore was appointed as such member of the police force, as aforesaid, under and by virtue of the laws of the said State of Illinois and the ordinance of said city of Chicago relating to the appointment and qualification of members and inspectors of the police force, which said ordinance of said city of Chicago relating to the appointment and qualification of members and inspectors of the police force of said city of Chicago is in words and figures as follows, to-wit:

" '1731. *Department established.*)—There is hereby established an executive department of the municipal government of the city which shall be known as the department of police, and shall embrace the general superintendent of police, an assistant general superintendent of police, a secretary of the department of police, a private secretary to said general superintendent, one inspector of police for each police division, one captain of police for each police district, and such number of lieutenants, detective sergeants,

patrol sergeants, desk sergeants, patrolmen and other employees as may be provided by ordinance.

" '1732. *General superintendent—office created—appointment.*)—There is hereby created the office of general superintendent of police. 'He shall be appointed by the mayor, by and with the advice and consent of the city council.

" '1734. *Management of department—appointment of members.*)—The general superintendent shall have the management and control of all matters relating to the department, its officers and members. He shall appoint, according to law, all officers and members of said department.'

"Which said ordinance relating to the appointment and qualification of police officers were before then duly passed, adopted and promulgated, according to law, as ordinances of said city of Chicago by the city council and mayor of said city of Chicago, and was then and there a part of the laws in force in the said city of Chicago; that said ordinance so passed, adopted and promulgated also prescribed in and by another section thereof the duties of the police officers and inspectors of said city of Chicago, which said section thereof is in words and figures as follows, to-wit:

" '1760. *Police duties—power of arrest.*)—The several members of the police force of the city of Chicago, when on duty, shall devote their time and attention to the discharge of the duties of their stations according to the laws and ordinances of the city and the rules and regulations of the department, to preserve order, peace and quiet and enforce the laws and ordinances throughout the city. They shall have power to arrest all persons in the city found in the act of violating any law or ordinance or aiding or abetting in any such violation, and shall arrest any person found under circumstances which would warrant a reasonable man in believing that such person had committed or is about to commit a crime.'

"Which said section of said ordinance was then and there a part of the laws in force in said city of Chicago; that it was then and there the duty of said Edward Mc-Cann to enforce a certain ordinance of the city of Chicago relating to houses of ill-fame and assignation, which said ordinance of said city of Chicago relating to houses of ill-fame and assignation is in words and figures as follows, to-wit:

" '1456. No person shall keep or maintain a house of ill-fame or assignation, or place for the practice of fornication or prostitution or lewdness, under a penalty of not to exceed $200 for every twenty-four hours such house or place shall be kept or maintained for such purpose.'

"Which said ordinance relating to houses of ill-fame and assignation was before then duly passed, adopted and promulgated, according to law, as an ordinance of said city of Chicago by the city council and mayor of said city of Chicago and was then and there a part of the laws in force in said city of Chicago, and it was the duty of said Edward McCann then and there to arrest, complain against, summon, prosecute and appear as a witness against the violators of said ordinance and law; that Harry Hoffman, Bertha Gordon, Sarah Gordon, Sam Cooperman, Louis Levine, Charles Yanker, Louis London, Mrs. Schwartz, (whose first name is to the said jurors unknown,) Max Yanker, Sam Arnstein, Max Plummer, Louis Sutta, Dutch Heitler and one Weiss, (whose first name is to the said jurors unknown,) each then kept and maintained a certain house of ill-fame and place for the practice of prostitution in said city of Chicago, county and State aforesaid, contrary to the statutes of the State of Illinois and the said ordinances of said city of Chicago, and thereby each of them became indebted to the said city of Chicago in a sum of money not to exceed $200, and each of them then and there rendered themselves liable, by reason thereof, to pay the fines provided by law in that regard; and said Ed-

ward McCann then and there contriving and intending the powers and duties of his said office and the trust and confidence thereby reposed in him to violate, prostitute and betray, and contriving and intending then and there the powers and duties of his said office to discharge and perform contrary to law and with the intent and for the purpose of being influenced in his acts and doings in the performance of his said duty, to-wit, the duty of enforcement of the terms of the said ordinance relating to houses of ill-fame and assignation then brought before him, said Edward McCann, in his official capacity as a police officer and inspector of the said city of Chicago, and to then and there cause him, the said Edward McCann, to execute the powers in him vested as a police officer and inspector as aforesaid, and to perform said duty of him required with partiality and favor to the said Harry Hoffman, Bertha Gordon, Sarah Gordon, Sam Cooperman, Louis Levine, Charles Yanker, Louis London, Mrs. Schwartz, (whose first name is to the said jurors unknown,) Max Yanker, Sam Arnstein, Max Plummer, Louis Sutta, Dutch Heitler and one Weiss, (whose first name is to the said jurors unknown,) and contrary to the terms of said ordinance relating to houses of ill-fame and assignation and contrary to law in said city of Chicago, then and there knowingly, corruptly and feloniously did take, accept and receive from Louis Frank, while he, the said Edward McCann, was then and there on duty as police officer and inspector, as aforesaid, in the said city of Chicago aforesaid, a large sum of money, to-wit, the sum of $475 in money, of the value of $475 lawful money of the United States of America, as a bribe, present and reward offered and given by said Louis Frank, and by him, said Edward McCann, then and there taken, accepted and received with the unlawful, wicked and corrupt purpose and intent of influencing him, the said Edward McCann, in his office aforesaid, in his acts and doings in his said official capacity of member of the police

force of said city of Chicago and inspector thereof, in the matter of the enforcement of the terms of the ordinance aforesaid relating to houses of ill-fame and assignation, and in the collection of the indebtedness aforesaid due to said city of Chicago, and in the enforcement of the laws aforesaid, and to wickedly and corruptly cause him, said Edward McCann, to execute the powers in him vested as a member of the police force and inspector, as aforesaid, and to perform his said duties of him required by law with partiality and favor, and to then and there induce him, the said Edward McCann, in his office aforesaid, to permit, authorize and allow said keepers of houses of ill-fame and assignation to keep, use and occupy buildings and rooms for the purpose of prostitution and assignation and lewd-ness, and to induce and influence him, the said Edward McCann, then and there and thereafter not to arrest nor cause to be arrested the said keepers of said houses of ill-fame and assignation, and to keep and protect them from arrest and punishment, and free, clear and exempt from municipal or police molestation, interference or attack while engaged in the keeping, using and occupying of buildings and rooms for the purpose of and devoted to the practice of prostitution and assignation and lewdness, contrary to the statute and against the peace and dignity of the same People of the State of Illinois."

JAMES HAMILTON LEWIS, and CORNELIUS LYNDE, (WALLACE I. STREETER, of counsel,) for plaintiff in error:

The indictment does not state facts showing that the plaintiff in error comes within the class to whose misdoings, alone, any Illinois bribery statute applies. There is nothing in the first four counts from which any State court can see that there exists such an office as inspector of police of the city of Chicago or member of the police force of the city of Chicago. *Stott* v. *Chicago,* 205 Ill. 281; *Bullis* v. *Chicago,* 235 id. 475.

There is nothing in the ordinances pleaded in the fifth count which shows the legal existence of any office of which it is claimed the defendant is the *de jure* or *de facto* occupant. *Stott* v. *Chicago,* 265 Ill. 281; *Moon* v. *Mayor,* 214 id. 40; *Bullis* v. *Chicago,* 235 id. 475; *People* v. *Chicago,* 210 id. 479.

Section 31 of the Criminal Code and section 8 of article 6 of the Cities and Villages act apply only to "any executive, ministerial or other officer of any incorporated city" and to "any officer of the corporation." These criminal statutes cannot be stretched by construction to apply to any but either *de facto* or *de jure* occupants of an office existing *de jure*. *United States* v. *Germaine,* 99 U. S. 508; *United States* v. *Mullins,* 71 Fed. Rep. 682; *United States* v. *Ingham,* 97 id. 935; *People* v. *Burke,* 226 Ill. 203; *People* v. *Knopf,* 183 id. 410; *Norton* v. *Shelby County,* 118 U. S. 441.

There was a fatal variance between the crime the People's evidence tended to prove and that charged in the indictment. The indictment charges that McCann was paid $475 by Louis Frank to permit houses of prostitution kept by certain persons to run and operate, in violation of McCann's official duty to enforce the law against them. The evidence is that Louis Frank acted as the agent of McCann in "collecting,"—*i. e.,* extorting,—money paid as "protection" by keepers of houses of prostitution.

The essence of bribery is to receive money to violate an official duty or to refrain from enforcing an official duty. The official duty furnishes the test of the existence of the crime. *State* v. *Butler,* 178 Mo. 272; *State* v. *Mysenburg,* 171 id. 1.

Proof of extortion or receiving money under false pretenses, though found in this record, will not support a conviction of bribery. *Bromley* v. *People,* 150 Ill. 297; *Graham* v. *People,* 181 id. 477; *Lowell* v. *People,* 229 id. 227.

W. H. STEAD, Attorney General, and JOHN E. W. WAY-
MAN, State's Att'y, (THOMAS MARSHALL, FREDERIC BURN-
HAM, and CLAUDE SMITH, of counsel,) for the People:

There being legal authority for the establishment of a
police force, a police officer, a member of that force, is not
only an officer of the incorporated city within the meaning
of the bribery statute, but is also an officer of the State
within the meaning of that statute. *Bunn* v. *People,* 45
Ill. 397; *Chicago* v. *Wright,* 69 id. 318; *Wilcox* v. *People,*
90 id. 186; *People* v. *Loeffler,* 175 id. 585; *Cahill* v. *Peo-
ple,* 106 id. 624; *Chicago* v. *Williams,* 182 id. 138; *Ptacek*
v. *People,* 194 id. 125; *Smith* v. *Ryan,* 100 Va. 199; *Burch*
v. *Hardwicke,* 30 Gratt. 24.

An inspector of police of the city of Chicago is an offi-
cer within the meaning of section 31 of the Criminal Code,
which includes "any officer elected or appointed by virtue
of any law of this State." *Ptacek* v. *People,* 194 Ill. 124;
*Chicago* v. *Wright,* 69 id. 318.

Whether or not a defendant is an officer within mean-
ing of section 31 of the Criminal Code will depend upon
the powers that he exercises, rather than upon the method
of his appointment or election. *Bunn* v. *People,* 45 Ill.
397; *Ptacek* v. *People,* 194 id. 125; *Chicago* v. *Wright,*
69 id. 318; *Wilcox* v. *People,* 90 id. 186; *People* v. *Loef-
fler,* 175 id. 585.

Municipal officers are included within section 31 of the
Criminal Code. Section 8 of article 6 of the Cities and
Villages act has been wholly superseded by section 31 of
the Criminal Code,—the bribery statute. *Jaehne* v. *People,*
103 N. Y. 182; *People* v. *Swift,* 59 Mich. 529; *Guthrie*
v. *State,* 16 Neb. 667; *Culver* v. *Bank,* 64 Ill. 528; *Devine*
v. *Cook County Comrs.* 84 id. 590; *Andrews* v. *People,*
75 id. 605; *People* v. *Board of Education,* 166 id. 386;
*People* v. *Thornton,* 186 id. 162; *State Board* v. *Ross,* 191
id. 87; *Canal Comrs.* v. *East Peoria,* 197 id. 236; 1 Lewis'

Sutherland on Stat. Const. secs. 251, 252; *Sullivan* v. *People,* 15 Ill. 233; *Rodney* v. *Railroad Co.* 19 id. 442.

The acts and declarations of Frank done in furtherance of the common design between himself and McCann were admissible against McCann, and this is true whether Frank was indicted with McCann or not. *State* v. *Grant,* 86 Iowa, 216; Roscoe on Crim. Evidence, (8th ed.) 575; 1 Greenleaf on Evidence, sec. 111; *Card* v. *State,* 109 Ind. 418; *Samples* v. *People,* 121 Ill. 550; *Mason* v. *State,* 42 Ala. 532; 12 Cyc. 448, note 87.

The proof of guilt in this case is so overwhelming that the remarks of the State's attorney complained of could have had no prejudicial effect. *Spahn* v. *People,* 137 Ill. 546; *Schroeder* v. *People,* 196 id. 214; *Bulliner* v. *People,* 95 id. 405; *Sanders* v. *People,* 124 id. 225; *Gallagher* v. *People,* 211 id. 169; *Siebert* v. *People,* 143 id. 591; *Railway Co.* v. *Cotton,* 140 id. 485; *Railway Co.* v. *Foster,* 226 id. 295.

Mr. JUSTICE FARMER delivered the opinion of the court:

Many grounds are urged for a reversal of the judgment. Not all of them could be treated separately within the reasonable limits of an opinion. We have given the entire record and the briefs and arguments of the respective counsel the careful investigation that the importance of the case to plaintiff in error and to the public requires, and our conclusions are based upon a consideration of all the questions raised by the assignment of errors which are discussed in the briefs, though we shall treat in detail only those that appear to us most important.

It is contended the criminal court erred in overruling the motion of plaintiff in error to quash the indictment, principally for the reason that it does not appear from the allegations of any count that plaintiff in error was an officer within the meaning of section 31 of the Criminal

Code or section 8 of article 6 of the Cities and Villages act. The officers designated by section 31 of the Criminal Code who may commit the crime of bribery are "any judge, justice of the peace, sheriff, coroner, clerk, constable, jailer, Attorney General, State's attorney, county attorney, member of the General Assembly, or other officer, ministerial or judicial, or to any legislative, executive or other officer of any incorporated city, town or village, or any officer elected or appointed by virtue of any law of this State." The officers mentioned in section 8 of article 6 of the Cities and Villages act are "any member of the city council or board of trustees or any officer of the corporation."

Plaintiff in error insists that none of the counts describe any office designated under section 31 of the Criminal Code, and none of them allege facts showing the legal existence of any such office of the incorporated city of Chicago as inspector of police. It must, we think, be conceded that unless the allegations of the indictment show plaintiff in error to have been an officer of the city of Chicago they do not show him to have been an officer within the meaning of either of the bribery statutes mentioned.

The city of Chicago is, and has been since 1875, under the Cities and Villages· act. Section 1 of article 6 of that act provides for the election of a mayor, city council, city clerk, city attorney and city treasurer. Section 2 authorizes the city council, by ordinance, to provide for the election by the legal voters or the appointment by the mayor, with the approval of the council, of certain other officers named, "and such other officers as may by said council be deemed necessary or expedient." Section 1731 of the ordinance, set out in the fifth count of the indictment, establishes an executive department of the city to be known as the department of police, and to embrace "a general superintendent of police, an assistant general superintendent of police, * * * one inspector of police for each police division, one captain of police for each police district, and such num-

ber of lieutenants, detectives, sergeants, patrol sergeants, desk sergeants, patrolmen and other employees as may be provided by ordinance." Section 1732 provides for the appointment of the general superintendent by the mayor, by and with the advice and consent of the council, and section 1734 provides for the appointment of all other officers and members of the department by the general superintendent.

The power to appoint persons to fill offices established by ordinance is vested by the statute in the mayor with the approval of the city council, and could not lawfully be delegated to another officer. (*Bullis* v. *City of Chicago,* 235 Ill. 472.) The city council may, by ordinance, create offices, but they must be filled by the authority and in the manner prescribed by the statute. (*Moon* v. *Mayor,* 214 Ill. 40.) It follows that as plaintiff in error was never elected inspector of police and was never appointed to said office in any manner authorized by law, he never was, in fact, a *de jure* officer. We do not, however, think this a controlling question in determining the sufficiency of the indictment. If plaintiff in error was seeking to establish his title, or some right depending upon a valid title, to the office of police inspector, he would be required to show that he is a *de jure* officer. (*Stott* v. *City of Chicago,* 205 Ill. 281; *McNeill* v. *City of Chicago,* 212 id. 481; *Bullis* v. *City of Chicago, supra; Moon* v. *Mayor, supra.*) But, as between himself and third parties, (the State in this case,) if the office of inspector of police of the city of Chicago had a legal existence and plaintiff in error assumed the duties and discharged the powers and functions of the office he became a *de facto* officer, and cannot be permitted to deny his responsibility, while so acting, on the ground that he was not legally elected or appointed to said office. We are of opinion the ordinance pleaded did create the office of inspector of police. It is not, and could not be, questioned that the ordinance did establish the department

of police and create the office of general superintendent. The same section of the ordinance provides that as a part of the department there shall be one inspector of police for each police division. True, by another section of the ordinance provision is made for the appointment of the general superintendent in a manner authorized by law and no such provision is made with reference to filling the office of inspector. The city council had the power to create the office of inspector but could only provide for filling it in the manner designated by statute.

It does not follow, however, that because the ordinance providing for the manner of appointing an inspector was invalid, and there was, therefore, no legal manner of filling the office, the ordinance creating the office is not valid. The decision of this question is not controlled by the decisions in the *mandamus* and *certiorari* cases above cited, as counsel contend. Those cases involved the *de jure* right of parties to the offices of police patrolmen and sergeants. In some of them the ordinances were pleaded and in some they were not. It was held it was not shown that said offices had any legal existence, but it must not be overlooked that the provisions of the ordinance as to the creation of those offices are entirely different from the provision relating to the creation of the office of inspector. The ordinance provides that the department of police "shall embrace  *  *  *  one inspector of police for each police division." With reference to the offices of sergeants and patrolmen the ordinance provides that the department of police "shall embrace  *  *  *  such number of lieutenants, detective sergeants, patrol sergeants, desk sergeants, patrolmen and other employees as may be provided by ordinance." The distinction was pointed out in *Bullis* v. *City of Chicago, supra.* The ordinance before the court in that case was substantially like the ordinance now before us. In that case the word "prescribed" was used instead of the word "provided." The court said: "Section 1477

of the revised code, in providing that the police department should embrace as many patrolmen 'as has been or may be prescribed by ordinance,' cannot be regarded as creating any office of patrolmen. (*Moon* v. *Mayor, supra.*) The word 'prescribed,' as there used, is equivalent to 'established.' " Here, neither the office of inspector nor the number of inspectors is left to be "prescribed" or "provided" for by the ordinance, as is the case with respect to the offices of sergeants and patrolmen. As to them the ordinance provided that the department of police should embrace such number "as may be provided for by ordinance," and until they are "provided" for by an ordinance no such office exists.

The fifth count of the indictment sufficiently shows there was a *de jure* office of inspector of police, and that the plaintiff in error, at the time of the acts complained of, assumed to be such officer and was exercising the powers and duties of the office. The People were therefore not bound to allege or prove that he was a *de jure* officer. (*North* v. *People,* 139 Ill. 81.) The fifth count being good, it was sufficient to support the judgment, and even if the other counts are defective, the denial of the motion to quash was not such error as to require a reversal of the judgment. *Hiner* v. *People,* 34 Ill. 297; *Mayes* v. *People,* 106 id. 306; *Sahlinger* v. *People,* 102 id. 241; *Ochs* v. *People,* 124 id. 399; *Gallagher* v. *People,* 211 id. 158.

The objection that none of the counts of the indictment state "facts, acts or circumstances constituting any crime" we think not well taken.

It is contended by plaintiff in error that an officer of a city or village is not amenable to the provisions of section 31 of the Criminal Code; that that section is part of a general act and was intended to apply to other higher and more responsible officers than those of cities and villages, and that by section 8 of article 6 of the Cities and Villages act the legislature made special provision for the crime of

247—10

bribery committed by officers of a city or village, and such officers can be prosecuted and punished for bribery only under said section 8 of article 6. It is conceded by counsel for the State that the indictment in this case is based upon section 31 of the Criminal Code and plaintiff in error was prosecuted, convicted and sentenced under that statute. If the position of counsel for plaintiff in error is correct, the judgment would necessarily have to be reversed, for the punishment provided by the two statutes is entirely different. The punishment provided by section 31 is imprisonment in the penitentiary not less than one nor more than five years, while the punishment provided by section 8 of article 6 is imprisonment in the penitentiary not exceeding two years, or fine not exceeding $5000, or both, in the discretion of the court. By instructions given at the request of the People the court defined bribery in the language of section 31, and told the jury the penalty provided by the statute for said offense was confinement in the penitentiary for a term not less than one nor more than five years. By their verdict the jury found plaintiff in error guilty in manner and form as charged in the indictment, and the court sentenced him to confinement in the penitentiary at Joliet until discharged according to law, provided such term should not exceed the maximum term for the crime for which he was convicted and sentenced.

Section 86 of chapter 30 of the Revised Statutes of 1845, entitled "Criminal Jurisprudence," related to the offense of bribery of public officers and the punishment for said offense. The officers embraced in that statute who were amenable to its provisions were "any judge, justice of the peace, sheriff, coroner, clerk, constable, jailer, Attorney General or State's attorney, member of the General Assembly or other officer, ministerial or judicial." The punishment fixed was imprisonment in the penitentiary for a term not less than one nor more than five years. In *Walsh v. People,* 65 Ill. 58, it was held this statute did not include

an alderman. In 1872 the legislature passed an act entitled "An act to amend chapter 30 of the Revised Statutes, entitled 'Criminal Jurisprudence,' so as to prevent misfeasance in office, or charging or receiving illegal fees, and in giving or offering to give, or receiving or offering to receive, a bribe." This act consisted of three sections, and was approved April 9, 1872, and in force July 1, 1872. The first and second sections relate to officers charging, demanding or receiving illegal fees. The third section makes it bribery for "any officer of any city or incorporated town or village" to receive any money, present, etc., for the purpose of influencing him to execute the powers vested in him or to perform any duty required of him with partiality or favor or otherwise than is required by law, and the punishment is fixed at imprisonment in the penitentiary for a term not less than one nor more than five years. The Cities and Villages act was approved April 10, 1872, (one day later than the act just referred to,) and went into effect on July 1 of that year. Section 8 of article 6 of that act makes it bribery for "any member of the city council or board of trustees or any officer of the corporation" to accept any gift, etc., under any agreement or understanding "that his vote, opinion, judgment or action shall be influenced thereby, or shall be given in any question, matter, cause or proceeding' then pending, or which may by law be brought before him in his official capacity." The punishment for the offense is fixed at imprisonment in the penitentiary at not exceeding two years, or by fine not exceeding $5000, or both, in the discretion of the court, and the person convicted shall forfeit his office and be disqualified from thereafter holding any public office, trust or appointment under the city or village. "An act to revise the law in relation to criminal jurisprudence," generally known as the Criminal Code, was approved March 27, 1874, and went into effect July 1 following. Section 31 of that act is the one under which this indictment was drawn and the

plaintiff in error convicted and sentenced. It designates as officers amenable to its provisions the same officers mentioned in the act of 1845, and in addition thereto county attorneys, and "any legislative, executive or other officer of any incorporated city, town or village, or any officer elected or appointed by virtue of any law of this State." The punishment provided is imprisonment in the penitentiary not less than one nor more than five years.

It would seem the only purpose of passing section 3 of the act approved April 9, 1872, to amend the act of 1845, entitled "Criminal Jurisprudence," was to make city and village officers subject to prosecution for bribery. The day following its approval the Cities and Villages act was approved, which also made city and village officers liable to prosecution and conviction for bribery and fixed a different punishment from the amendment to the act of 1845. Obviously, those two acts were intended for the same purpose, namely, the punishment of city and village officers for bribery, but, being inconsistent, both could not stand, and under a familiar rule of statutory construction the subsequent act, which is the Cities and Villages act, must be held to have repealed the amendment of 1872. The Cities and Villages act then contained the only provision of our statutes making city and village officers liable for bribery until 1874, when the "act to revise the law in relation to criminal jurisprudence" was adopted. We have seen section 31 of that act included all city and village officers, and made their punishment, on conviction, the same as that of the other officers therein named. If, as contended by the plaintiff in error, it was the intention of the legislature that city and village officers should be subject to prosecution for bribery under section 8 of article 6 of the Cities and Villages act only, and that section 31 of the Criminal Code should apply to other officers, it is difficult to understand why, in enacting section 31, the legislature made it applicable to "any legislative, executive or other officer of any

incorporated city, town or village." Officers of that class were not embraced in the Criminal Code prior to the revision of 1874, and unless the legislature meant they should be amenable to that act, then there could have been no purpose for including them within its provisions. By the plain letter of section 31 city and village officers are subject to prosecution under and to the penalties provided by that act. The legislature must be assumed to have known of section 8 of article 6 of the Cities and Villages act when section 31 was amended by the revision of 1874, and it must have been the legislative intent to include in the general act all officers intended to be made liable for the crime of bribery. To hold otherwise it would have to be decided that the words "any legislative, executive or other officer of any incorporated city, town or village," in the act of 1874, are meaningless. Conceding that if it appeared to have been the intention of the legislature that city and village officers should be subject only to the provisions of section 8 of article 6 effect should be given to that intent even though such officers might also be embraced in some general description of officers enumerated in section 31, such an intention is negatived by the specific designation of city and village officers in said section 31. In *People* v. *Town of Thornton,* 186 Ill. 162, it was said (p. 174): "It is also a well settled principle that where two statutes are clearly repugnant to each other, the one last enacted operates as a repeal of the former; and this principle is applicable even though the prior statute is a local or special act which is repugnant to a subsequent general act. * * * There is no rule which prohibits the repeal of a special act by a general one, and the question is always one of intention." Numerous decisions of this court and other authorities will be found cited in the opinion in that case which sustain the rule announced.

A case very much in point is *People* v. *Jaehne,* 103 N. Y. 182; 8 N. E. Rep. 374. In that case the defendant

was a member of the common council of the city of New York. He was tried and convicted for bribery. The indictment charged the defendant with agreeing to receive $20,000 for his vote and influence in favor of an application by the Broadway Surface Railroad Company, a corporation, for permission to construct and operate a railroad on Broadway, in the city of New York. Defendant was sentenced to imprisonment in the State prison for a term of nine years and ten months under section 72 of the penal code. On appeal it was contended he was not punishable under that statute,—that he could only be liable to punishment for bribery under the New York City Consolidation act. Section 58 of the Consolidation act made any member of the common council, or any municipal officer, accepting a bribe guilty of a felony, and liable, on conviction, to imprisonment in the penitentiary for a term not exceeding two years, or to a fine not exceeding $5000, or both, in the discretion of the court. The penal code was, in fact, passed and went into effect before the Consolidation act did, but it contained a provision that it was to have the same effect as if it had been enacted after the Consolidation act. This provision the court held did not transcend the legislative power, and the Consolidation act was subordinated to the penal code wherever the two statutes were in conflict. The penal code made the penalty for bribery imprisonment for not more than ten years or a fine of not more than $5000, or both. Section 72 did not specifically mention municipal officers as liable to its provisions, but designated certain officers and also "a person who executes any of the functions of a public office." The court said, in part: "It is material, at the outset, to inquire whether the offense of bribery committed by municipal officers is, as a general rule, embraced within and punishable under this section of the penal code. If the section does not apply to the bribery of a municipal officer in any case, then, plainly, there is an end of the argument in support of this

conviction. If, on the other hand, the section applies, in general, to this class of officers, then it becomes necessary, in order to reverse the conviction, that it should be found that the special case of bribery committed by municipal officers in the city of New York is excepted or in some way taken out of the operation of this section. The comprehensive character of the provisions of the penal code relating to bribery, both in respect to the definition of the offense and the officers by whom it may be committed, is apparent upon the most cursory reading. * * * It is plain that a member of the common council, or other municipal officer, is a person 'who executes the functions of a public office,' and we cannot doubt that municipal officers are within the purview of section 72." The argument that the Consolidation act was special in its application to municipal officers and was not repealed by the subsequent general act on the same subject was answered by the court in the following language: "It will be found, I think, on examining the cases in which the courts have held that a special law was not repealed by a subsequent general law on the same subject, that they are, as a general rule, cases where the legislature was not dealing directly with the subject of the prior law and it was not in the mind of the legislature when the general law was enacted, or where the special law was part of a system of local administration, or where it was possible to assign a reasonable motive for retaining the special and peculiar provisions of the special act, notwithstanding the enactment of a subsequent general rule covering the same subject. The general Bribery act not only covers the whole subject, but was, we think, plainly intended to furnish the only rule governing the crime and punishment of bribery. It includes, by enumeration and description, all officials of every grade,— town, city, county and State officers,—provides a uniform punishment, but gives to the court a discretion in applying

it, within the limit prescribed, to meet the circumstances of the particular case."

We are of opinion section 8 of article 6 of the Cities and Villages act was superseded by section 31 of the Criminal Code, and that bribery of municipal officers is the subject of indictment and prosecution under said section of the Criminal Code.

It is earnestly contended by counsel for plaintiff in error that the evidence is insufficient to warrant the verdict of guilty and the judgment thereon. The testimony was very voluminous, and we can only refer to it in a general way and to the substance and character of its material points. The most important testimony given for the prosecution was that of Louis Frank, Julius Frank and S. B. Goldberg, though a number of other witnesses testified to facts of more or less importance and tending in a greater or lesser degree to corroborate the testimony of the principal witnesses. The assignment of error that the verdict and judgment are not supported by the evidence requires a somewhat more extended reference to the evidence for the prosecution than to that of the defense, though what we shall give is but the substance of what appear to us the most material matters testified to on the trial.

Patrick T. Mulvihill, a police officer at Desplaines street station, testified he and officer Griffin were assigned by the plaintiff in error to look after houses of prostitution in the district; that including saloons where women congregated there were ninety or ninety-five such houses in the district. The witness named as keepers of houses of prostitution the persons mentioned in the indictment. He testified that in pursuance of his instructions he carried in his pocket a book containing the names of all keepers of houses of ill-fame and the names of all the inmates; that the keepers were required to notify the station when any new girls came, and they were not allowed to stay in the house over

night until they had been taken to the station and an investigation made; that if a girl had not been in a house of ill-repute before she was not allowed to return. Other evidence showed that the custom in such cases was, if the woman was new to a life of shame, to send her to her parents or relatives or turn her over to some charitable or rescue organization. Mulvihill testified that he reported to plaintiff in error and in performing his duties acted under his instructions.

Louis Frank was the most important witness for the prosecution. He and his brother, Julius, were engaged in the saloon business at the corner of Madison and Halsted streets, which is in the Desplaines street district. They owned considerable real estate in the segregated vice district and houses of prostitution were run in two of their buildings. They had been in the saloon business in that district several years. Louis Frank testified he first met plaintiff in error after he had been made inspector of the Desplaines street district; that he was introduced to him by Charles Hawkins, desk sergeant of police under plaintiff in error; that afterwards plaintiff in error sent for him and he went to the station and saw plaintiff in error, and that plaintiff in error said to him he had been recommended by Hawkins and other good people and inquired of the witness if he could do some collecting for him; that witness replied he would let him know in a few days. Witness testified he went to his place of business, talked the matter over with his brother, went back to the station and told plaintiff in error he would do so; that plaintiff in error told him to collect the money and give it to Griffin, and that he did so for two months; that the plaintiff in error called witness over to the station and told him keepers of houses must pay $20 per month for each floor occupied, and if they did not deal square with him he would give their money back, and told witness to tell them so; that he did tell them, and they paid for both floors thereafter;

that the money was brought to witness' place of business by the parties running the houses and given to him, his brother or their book-keeper; that the number of the house paying was noted on a slip of paper pinned to the money and laid in the desk; that the money was paid the first of the month; that after the first two months, at the request of the plaintiff in error, witness delivered it to him in his office; that after five or six months plaintiff in error told witness he was being watched, and directed him not to put slips with each collection but to make one slip and put all the names and numbers on that; that witness had money and he might be searched; that after that the names and numbers were placed on a long slip, which he carried in the band of his hat to the station when he took the money to the plaintiff in error. The witness testified that on or about July 1, 1909, he delivered to plaintiff in error $475; that prior to that time, when plaintiff in error was ill, he twice took the money to him at his residence; that on the first occasion he went to the residence of plaintiff in error he was in bed; that the second time he was sitting up and Judge Fake was there, but the witness thought Judge Fake did not see him; that on each of these two visits the witness took alcohol, desired for use by plaintiff in error in his illness. The witness testified that afterwards he went to the residence of plaintiff in error twice with Max Plummer in an automobile; that Plummer kept a house of prostitution, and, the witness said, paid $40 a month for the plaintiff in error; that on the first of these visits Plummer wanted to talk with plaintiff in error something about some policeman "letting up;" that Plummer and his wife were arrested for pandering, and the witness testified Plummer asked him to go with him to see plaintiff in error; that when they went to the house plaintiff in error was up-stairs and both went in and talked to him; that they talked about the case and Plummer left the room; that witness then asked plaintiff in error what he was going to do about the

case; that plaintiff in error said that Plummer ought to pay $300; that witness said he would pay $250, and the plaintiff in error agreed to accept that amount; that witness told plaintiff in error Plummer would not pay until the case was disposed of, and plaintiff in error said witness could hold the check until the case was over; that after the case was disposed of satisfactorily, the witness got the check cashed and paid the money to the plaintiff in error. Witness testified he either took or sent alcohol to plaintiff in error a number of times while he was ill; that it cost him $2.80 a gallon and he paid for it himself. A woman named Jennie Streeter, known as "English Jennie," kept a house of prostitution at 17 Halsted street. The property belonged to the Frank brothers. Witness testified that on one occasion he took the money to the plaintiff in error for that place at the end of the month; that plaintiff in error inquired what was the matter that she did not pay promptly, and witness replied he did not know and said he would not collect from her; that plaintiff in error told him he had better make her move; that witness said he would do so, and afterwards rented the place to Charles Yanker; that when witness told this to the plaintiff in error he demanded $100, and witness paid it. The witness testified that Mike Heitler, known as "Mike the Pike," wanted to rent the place occupied by Mrs. Plummer; that plaintiff in error was told of it, and the matter was adjusted by Mr. Plummer paying him, through the witness, $50. The witness testified plaintiff in error sent for him to talk about a complaint that had been made in the city hall by Charles Yanker; that plaintiff in error asked him to get Yanker to withdraw it; that witness went to Yanker and told him what plaintiff in error had requested and he withdrew the complaint. Witness testified he was at the station one Saturday and the police brought in a woman and a man named Schatz; that Schatz, sergeant O'Malley and witness went into plaintiff in error's office; that Schatz told him he had

given $120 to Mike Heitler,—$40 a month,—and asked plaintiff in error if Heitler gave it to him; that plaintiff in error said he did not. Witness testified plaintiff in error refused to permit a hotel license to be issued for 185 West Madison street until witness got $50 from the man wanting the license and paid it to plaintiff in error. Witness went over the names of the persons mentioned in the indictment as keepers of houses of prostitution, gave the location of their places, and told how much he collected monthly from each and gave to plaintiff in error. He testified he had an agreement with plaintiff in error to discharge women whom the witness did not want prosecuted, who had been arrested and taken to the station, upon the payment to plaintiff in error by the witness of $10 for each woman discharged, and that he made him a number of payments for that purpose. Witness identified a number of checks drawn by Max Plummer on the Prairie State Bank, payable to the order of Frank Bros., which he said were given him for plaintiff in error, and that he (the witness) cashed them and gave plaintiff in error the money. Witness testified that all the money he received from keepers of houses of prostitution was for plaintiff in error and was given him for protection against police interference; that plaintiff in error said he would not bother them but they must stay inside the house. Witness testified that on one occasion plaintiff in error sent for him and he went to the station; that plaintiff in error, referring to "English Jennie," said, "That woman is hollering," and gave him $20 the witness had previously received from her and paid to plaintiff in error and told witness to give it back to her, and he did so. He testified he paid plaintiff in error $40 in February to let a woman named Evelyn Osborne out of prison, and that he received this from the woman's "fellow." The witness testified that on Monday before the indictment in this case was returned he had a talk with the plaintiff in error, and told him that he (witness) was ar-

rested and in trouble; that plaintiff in error said to him, "Tell those people to keep quiet." The witness could read Yiddish but could not read or write the English language.

Thomas O'Malley, a police officer at Desplaines street station, testified he had been there about a year and a half; that he was in plaintiff in error's office once when Schatz was in the office; that Schatz complained about "Mike the Pike" collecting $40 from him for protection money for two or three months; that he said he was collecting it for the inspector, and plaintiff in error said he never collected any money for him, and directed that "Mike the Pike" be notified he could not have any more women at his place; that nothing further was done about the matter.

Julius Frank testified he was in partnership with his brother, Louis; that shortly after plaintiff in error came to Desplaines street station he (witness) had a talk with his brother, and after that money was brought to their place; that the first month Louis received the money and witness made the slips pinned to it; that after that witness received money from the people named in the indictment; that prior to the talk with his brother he received no money from them; that it was never put with the money of witness and his brother but was kept in a place to itself; that the first two months officer Griffin came and got it; that when money was brought in and witness was absent the book-keeper made out the slips; that later all the entries were made on one slip and Louis would put it in his hatband and the money in his pocket; that witness went with his brother to the station once and saw him hand plaintiff in error a bundle of money. Witness testified that none of the money given him and his brother by keepers of resorts was kept by them; that prior to plaintiff in error becoming inspector they never collected money from those people. Witness identified a check signed by Max Plummer, drawn on the Prairie State Bank, payable to the order of Frank Bros., for $250, and said they kept the check in the desk

until the case against Plummer was over, then cashed it, placed the money with the other money for plaintiff in error and it was all turned over to him. The records offered later showed that Max Plummer and his wife, (under the name of Annie Green,) Louis Berg and Al Lekker, were jointly indicted for pandering; that the case came up for trial in November, 1908, and at the close of the evidence for the State, on motion of their counsel, the court directed a verdict of not guilty as to Max Plummer and Annie Green; that the other two defendants were convicted. At one time witness gave his brother $100 of their money to take to plaintiff in error with reference to the renting of 17 South Halsted street, but did not see it given to him and did not know that it was; that witness made an entry of it in their books; that the date was May 18.

John Rehm, a captain on the police force, testified he was stationed at Desplaines street station until June, 1909; that one night about eleven o'clock he met plaintiff in error and "Mike the Pike" on the street; that plaintiff in error inquired for Nathan's place and asked the witness to go in with him; that there was a saloon in one room and music hall in the other; that all sat down at a table and some girls joined them and they had some drinks; that they then went to Broderick's saloon; that on the way they passed Frank's, stepped in and had a drink; that witness left the plaintiff in error and "Mike the Pike" at Broderick's saloon about a quarter before twelve. Witness testified he saw "Mike the Pike" in plaintiff in error's outer office one day counting a handful of bills.

Max Friend testified he owned 13 North Peoria street and rented it to Max Plummer; that plaintiff in error requested witness to call at his office, and he did so; that plaintiff in error said he heard witness had rented his building to Mike Heitler, and that Mrs. Plummer did not like it; that witness said he was offered more rent than Mrs. Plummer was paying, and offered to let her have it but she

refused; that Heitler said there was some spite work between him and Plummer; that the plaintiff in error said Mrs. Plummer told him she was going to fight for possession and said the matter had better be fixed up; that witness said he could not fix it unless Heitler would surrender his lease; that the witness had Heitler and Max and Mrs. Plummer come to his office, and it was arranged that Heitler should surrender his lease and Mrs. Plummer continue to occupy it at the rental she had formerly paid.

John F. Tyrell, a lawyer, testified he was the attorney for Max Plummer and his wife in the pandering case; that plaintiff in error, since his indictment, had talked with witness three times about who paid witness his fees; that the first time plaintiff in error made the inquiry witness answered he did not remember definitely but supposed the defendant paid him; that plaintiff in error told witness he thought Louis Frank paid him; that witness promised to look the matter up; that the next talk they had witness told plaintiff in error he was about in the same condition as at their first talk; that the third time they talked witness said he would ask Max Plummer, but at best his own testimony would be vague and indefinite, to which plaintiff in error said, "Can't you kind of stretch your imagination and say you got it from Louis Frank?" that witness replied he did not think he could. Witness was shown two checks payable to him, signed by Max Plummer, and identified them as the checks Plummer gave him in payment of his fee. One was for $111, which included $11 stenographer's fees, and the other was for $50.

Judge Fake testified he visited plaintiff in error two evenings while he was ill, about the first of October. The witness said a friend was with him at his first visit and they went up-stairs where plaintiff in error was; that the next visit was about three weeks later; that they went in the rear room on the first floor, where plaintiff in error was; that a smooth-faced, stout man was also there and

witness thought he was introduced to him. Witness testified that in leaving he walked out through the parlor to the front door.

S. B. Goldberg testified he was a trusted employee and book-keeper of Frank Bros. and had been with them over two years. The witness testified he made slips placed with the money left with Frank Bros. by a number of persons named in the indictment as keepers of houses of prostitution; that when the money first began to come in Louis Frank would call off the name, number and amount, and witness would write it on a slip, pin it to the money and put the money in a certain place in the desk; that the money usually came in about the first of the month; that Julius Frank would write the slips when the witness was not there; that the first month Griffin came in with Louis Frank; that witness got off his chair and walked out; that when they came in there was $250 or $300 on the desk; that witness returned in three or four minutes and it was gone; that something similar occurred the second month; that after that Louis Frank would take the money; that later one long slip would be made by Julius Frank; that none of the money went into Frank Bros.' account; that it came in every month until July, 1909.

Plaintiff in error testified in his own behalf and emphatically denied the testimony of the Frank brothers about receiving any money from them or either of them, or that he ever talked with either of them about collecting the money from keepers of houses of prostitution. He denied receiving money at any time from any such source and denied receiving any of the money Louis Frank testified to paying him. He testified to efforts made by him and his subordinates, under his instructions,—and in this he was corroborated by other witnesses,—to control and minimize lewdness and prostitution in his district. He denied previous knowledge of intended visits of or being responsible in any way for any of the visits of Louis Frank to his resi-

dence, and testified he understood the alcohol was sent by
Hawkins. In short, he contradicted or explained substan-
tially most of the incriminating circumstances testified to
by Frank. Hawkins testified he gave the money to Louis
Frank for the alcohol and that Frank said he would send
it out by a messenger. He said it was true he introduced
Louis Frank to plaintiff in error. He testified that at the
time Capt. Rehms said Heitler had money in plaintiff in
error's outer office plaintiff in error ordered him out of
the station. Edward Dwyer, a policeman, testified Julius
Frank told him in February or March, 1909, that the new
czar (referring to the plaintiff in error) was breaking up
everything and everybody, and that if they could not get
him politically they would "job him;" that they always
got their man, and made other statements of like charac-
ter. There was testimony by other witnesses of the Franks
complaining of interference with business by the police and
threats by them against plaintiff in error. Some testimony
offered by the defense tended to impeach Louis Frank by
showing he had made complaints to parties of the actions
of the police under plaintiff in error's administration and
made statements which he denied in his testimony for the
People that he had made. Plaintiff in error and his sister-
in-law, who lived in his house, contradicted the testimony
of Louis Frank about the persons present, their location in
the house and the conditions surrounding, on the occasion
of his visits to the residence of plaintiff in error; also they
and two lady visitors who were present at the time Frank
testified Max Plummer went into the house and talked with
plaintiff in error, testified Plummer did not see plaintiff in
error; that he came in the door and started up-stairs and
Frank told him to go back, and that he went out to his
automobile and did not come in again.

There was other testimony, of more or less importance,
explanatory of transactions and acts testified to by the
Franks tending to favor plaintiff in error, and thirty or

more persons from the various walks of life,—clergymen, charity workers, business and professional men,—testified to the good reputation of plaintiff in error for honesty and integrity and for being a law-abiding citizen. The testimony, it can be seen, was conflicting. Some of it, on one side or the other, must have been untrue. If the testimony of the prosecution was believed, it was amply sufficient to warrant a conviction. If it was not believed and the testimony of plaintiff in error was believed, then the verdict should have been in his favor. Our opportunities for determining the weight and credibility of the evidence are much less favorable than were the opportunities of the jury and the judge who presided at the trial. If convictions could only be sustained where the proof was so strong and overwhelming as to exclude every possibility of innocence, instances would be rare where they could be sustained. It is the province of the jury to determine the weight and credibility of the testimony, and where their finding has received the sanction of the presiding judge, an appellate tribunal will not disturb the verdict, even in a criminal case, solely because the evidence is contradictory. Where the proof for the People is amply sufficient to warrant a conviction, its contradiction by the proof of the defendant will not warrant a reversal unless a consideration of all the evidence produces the conviction that the guilt of the accused is improbable or reasonably doubtful. While in this case the proof for the prosecution discloses a most revolting state of affairs and one we would be glad to know did not exist, there is enough circumstantial detail and corroboration in the testimony of the prosecution here to stagger one's faith in the integrity and honesty of plaintiff in error's administration of his official duties. It must be recognized as an irreparable wrong to an innocent man to convict him of so heinous a crime and incarcerate him in the penitentiary, but, on the other hand, it would be an irreparable wrong to the public to acquit one who is, in

fact, guilty of such an offense as is charged against plaintiff in error. It is the duty of courts to endeavor, as best they can, to see that justice is done both to the accused and the public, but as the agencies through which this result is sought to be attained are human and fallible the exact truth cannot always be demonstrated with absolute certainty.

We have not overlooked the contention of counsel for plaintiff in error that the Frank brothers, as appears from the evidence in this case, may not be the most exemplary citizens. Their business, environment and associations, it may be admitted, have not tended to elevate their moral natures. The jury and the trial judge, however, had all this before them, and had the opportunity, that we have not, of seeing and hearing them testify and observing their manner and demeanor while testifying. It does not necessarily follow that because one may not be an exemplary citizen he will not tell the truth. The jury and the trial judge thought the witnesses for the prosecution did tell the truth or the case would not be here. The matters and things the Franks testified to were, for the most part, matters about which there could not possibly have been any mistake. In these respects their testimony was either true or willfully and corruptly false. Being contradicted, it became the peculiar province of the jury to determine on which side the truth lay.

This court will not hesitate to reverse judgments of conviction in criminal cases when the proof for the prosecution, considered with all the evidence in the case, is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of guilt, but it will not usurp the functions of the jury by substituting its judgment for theirs in passing on the weight and credibility of conflicting testimony. In *Hanrahan* v. *People,* 91 Ill. 142, defendant was convicted of an assault with intent to commit murder. It was insisted the verdict and judgment were contrary to the evidence. The court said, on page 148: "As regards the

question of fact, it is true that the evidence is contradictory. It was the province of the jury to judge of the credibility of the witnesses. If they believed the witnesses in behalf of the prosecution their finding was justified by the evidence. They had the better opportunity to judge of the credibility and weight to be attached to the testimony of the several witnesses." In *Rogers* v. *People,* 98 Ill. 581, defendant was convicted of the crime of burglary. The only testimony connecting him with the crime was that of a boy ten years old. Defendant denied his guilt and was corroborated by the testimony of two women. The court said, on page 583: "The boy was a competent witness although so young in years, and if believed, the jury were justified in finding the verdict they did. They did believe the boy and disbelieved the story of the other witnesses. We can not say they erred in this and found a verdict which was against the evidence." The rule announced in those cases has been frequently reiterated in other cases. (*Steffy* v. *People,* 130 Ill. 98; *People* v. *Horchler,* 231 id. 566; *Rafferty* v. *People,* 72 id. 37; *Gainey* v. *People,* 97 id. 270.) We would not be justified in disturbing the judgment in this case on the ground that it was not warranted by the evidence.

The court permitted the prosecution to introduce in evidence four checks for $40 each and one for $250, drawn by Max Plummer on the Prairie State Bank, payable to Frank Bros. The checks were all stamped paid, and Louis Frank testified they were given for plaintiff in error and that he paid him the money obtained on the checks; that the four $40 checks were the monthly contributions of Plummer for protection for his house of prostitution, and the $250 check was for services of plaintiff in error in connection with the indictment against Plummer and his wife. It is insisted these checks were incompetent evidence. It is true, nothing appeared upon the checks tending to show plaintiff in error received the money, and they did not cor-

roborate the statement of Louis Frank that he gave the money received on the checks to plaintiff in error. They did, however, corroborate his statement that he received some of the money he said he paid plaintiff in error from Max Plummer on checks. It was not claimed by the prosecution that the plaintiff in error had any knowledge of any of the checks given by Plummer except the one for $250, which Frank testified it was agreed he should hold until the case against Plummer and his wife was disposed of. The introduction in evidence of these checks confirmed Frank's testimony that he received money from Max Plummer. What he did with it depended on other testimony in the case. We do not think plaintiff in error has any substantial basis for complaint on account of the admission in evidence of the checks.

Complaint is made that the court admitted hearsay evidence on behalf of the prosecution. The principal instances complained of were the following: Louis Frank testified plaintiff in error asked him to request Charlie Yanker to withdraw a complaint he had made at the city hall. The court permitted Frank to testify that he went to Yanker and told him plaintiff in error wanted him to withdraw the complaint and Yanker promised to do so. Louis Frank testified to giving plaintiff in error $100 of his and his brother's money to obtain permission for Yanker to run a place at 17 South Halsted street which belonged to the Frank brothers and had been rented by them to Yanker. Julius Frank testified to giving Louis $100 of the firm's money, and that Louis said at the time it was for plaintiff in error for permission to Yanker to run the place. Louis Frank testified that when he went to see the keepers of houses of prostitution about paying for protection, at the request of plaintiff in error, he told them "the inspector says he won't stand for you if you got women up-stairs; that you got to pay $20 for up-stairs and $20 for down-stairs." According to the testimony of Louis Frank he

was acting for and on behalf of plaintiff in error, and the statements proven to have been made by him to Yanker and other keepers of houses of prostitution were in carrying out the instructions of plaintiff in error. It was impossible, in the nature of things, that Frank could have collected tribute from a large number of people every month to protect them from police interference without disclosing to them what it was for. He testified plaintiff in error directed him to tell them what he said and he was simply carrying out the instructions of his principal, and we think his testimony that he told them what his principal directed him to tell them was competent. (*Samples* v. *People*, 121 Ill. 547; *Card* v. *State*, 109 Ind. 415.) While the testimony of Julius Frank that his brother told him what he wanted the $100 for was not strictly competent, its admission was not of such a prejudicial character, in view of all the other evidence in the case, as to require a reversal of the judgment.

It is contended the court erred in giving a large number of instructions on behalf of the People. We have examined the instructions complained of, and the criticisms made of them, with care, and find no reversible error was committed in giving them. The most serious complaint is made of instruction No. 32. That instruction told the jury that even though they believe, from the evidence, that the plaintiff in error, while acting as a police officer, caused persons to be arrested from houses of prostitution run by persons named in the indictment, still if they further believe, from the evidence, beyond a reasonable doubt, that he collected money from them through Louis Frank with the intent and purpose of permitting them to run within the city of Chicago in manner and form as charged in the indictment, they should find him guilty. It is said this instruction was erroneous because the indictment did not charge plaintiff in error with collecting money from persons through Louis Frank, and that under the instruc-

tion he might have been found guilty of some other charge than the one upon which he was being tried. We do not think the instruction was prejudicial to plaintiff in error or could have misled the jury. While the charge was that plaintiff in error received money as a bribe from Louis Frank, the evidence for the prosecution was that Frank collected it first, by direction of plaintiff in error, from those who were to be favored by him in administering the duties of his office, and the instruction, in view of the evidence, considered with all the other instructions in the case, was not erroneous.

Serious complaint is made of statements of the State's attorney to the jury in his closing argument. Some of these complaints are not without justification and we think should not be passed over without some comment. We will only notice the most objectionable conduct of the State's attorney in his closing argument.

One of the positions of the defense on the trial of the case was that the witness Louis Frank was actuated by malice toward plaintiff in error because of his interference with certain business the witness was interested in, and for the purpose of proving such malice, thereby affecting his credibility, plaintiff in error introduced at a witness Fred Boyer, an insurance man. The witness testified that he met Frank one morning on the front platform of a street car, spoke to him and inquired, "How is business?" that Frank replied, "Business is very poor; the administration is not letting up any." On cross-examination the State's attorney asked the witness if he was not in the army in the Philippines. The witness replied he was. The State's attorney then asked him if he was not convicted, while in the army, for embezzlement. The witness replied, "No, sir." The State's attorney then asked him if he was not sentenced to dismissal and one year's confinement and if the sentence was not afterwards held to be illegal. This was objected to and the objection sustained. One of coun-

sel for plaintiff in error, in his argument to the jury, referred to the cross-examination of this witness and said, "Boyer was not a man convicted as an embezzler," and charged the State's attorney with attempting to create suspicion against the witness because he had testified to something in behalf of plaintiff in error. The State's attorney, in his closing argument, referred to the statement of counsel for plaintiff in error that it was not proved the witness Boyer had been convicted of embezzlement in the Philippine Islands, and said, "But it is true, and I have in my hand a telegram from the war department which shows it is true, and I am going to read it to this jury so that they may know that it is true." Counsel for plaintiff in error objected, and the State's attorney stated he insisted on reading it and said he thought he had a right to do so. The court sustained the objection and the telegram was not permitted to be read. Counsel for the People justify this conduct of the State's attorney because, they assert, counsel for plaintiff in error had argued a matter to the jury that had been ruled out by the court and used it as a basis for ridiculing the State's attorney and creating prejudice against him in the minds of the jury.

The plaintiff in error testified that he entered the police force of the city of Chicago as patrolman September 21, 1891; that he held that position about two years and was then promoted to sergeant and sent to South Chicago; that he held that position a little over eleven months; that in May, 1896, he was reduced to patrolman; that afterwards he took the civil service examination and was appointed sergeant; that he held that office a little more than three years and then became lieutenant; that he was made captain in 1906; that in March, 1908, he was appointed inspector and assigned to the Desplaines street division. His counsel, in their argument to the jury, stated that during all the time of his service on the police force no charge had been made against him; that owing to the "mutations of

politics" he had been reduced from sergeant to patrolman, and that he had advanced from post to post until appointed to the position he occupied at the time of his indictment. In his closing argument the State's attorney said counsel for plaintiff in error had no right to argue that nothing was shown against him or that no charge had ever been made against his record, "because that is not a fact; they have no right to argue it because they know it is not true."

Mr. Neely: "What evidence is there here that it is not true?

Mr. Wayman: "The records of the office in the hands of Si Mayer show exactly opposite to what you say is true. There is no evidence that he never had a black mark in the police department, but I have as much right to argue that he had as you have to argue that he had not.

Mr. Neely: "Oh! that is simply your opinion.

Mr. Wayman: "No, no, no. It is substantiated by the records.

Mr. Neely: "Well, it is not in evidence, if your honor please.

Mr. Wayman: "Just as much as yours is, and I have just as much right to argue on it as you have.

The court: "Neither side can argue before the jury about anything not in evidence.

Mr. Wayman: "That is the point they first brought up—

Mr. Neely: "I object to his statement, if your honor please."

The court sustained the objection and said: "If one side has argued about anything not in evidence that does not warrant the other side arguing about matters not in evidence. No, counsel must keep within the record on both sides."

The State's attorney attempted to justify this conduct on the ground that counsel for plaintiff in error were unfair in their argument; that they frequently went outside

the record and in various ways conducted themselves in
an improper manner, which was unfair toward the prosecu-
tion and the State's attorney and greatly annoyed and irri-
tated him.    Conceding this all to be true as alleged, it
furnishes no justification for the State's attorney, whose
office is semi-judicial and who owes a duty to defendant
as well as the people, to resort to similar tactics.    However
aggravating and unfair counsel for the defense may be in
argument to the jury,—and in this case the complaint of
the State's attorney is not without foundation,—it is to be
remembered they are not on trial, and if anyone is made
to suffer from improper argument of the State's attorney
it is the defendant,—not his counsel.    Necessarily, consid-
erable latitude must be allowed in argument to a jury, but
under no circumstances is it allowable to either party to
go outside the record in the manner shown by the examples
above given.    If either side transgresses the rule, the court
has the power, and self-respect as well as the orderly ad-
ministration of justice demands that it exercise the power,
to control the argument within proper bounds.    "It is the
duty of the court to regulate the trial and the argument
and conduct of attorneys, to preserve the dignity and de-
corum of the proceedings, to prevent wrangles between at-
torneys and to compel obedience to rulings and decisions."
*North Chicago Street Railroad Co.* v. *Leonard,* 167 Ill. 618.

Complaints of improper arguments of counsel have fre-
quently been considered by this court and judgments have
sometimes been reversed on account of them.    In *Gallagher*
v. *People,* 211 Ill. 158, the court said (p. 169) :   "It is
very difficult to lay down an inflexible rule as to the proper
limit of an argument upon the facts and circumstances of
a case, and unless the court can see that statements are
unprovoked or so foreign to the case as to be calculated
to produce a result which otherwise would not have been
reached, a judgment of conviction will not be reversed on
that ground.    The matter is one which must in every case

be very largely entrusted to the discretion of the presiding judge." In *Bulliner* v. *People,* 95 Ill. 394, the court said (p. 405) : "The trial judge should always see that the line of argument is kept within reasonable bounds and not allow the defendant to be convicted or prejudiced on account of real or imaginary crimes for which he is not upon trial, and unless for a palpable abuse of discretion in this regard, manifestly tending to an improper conviction, there should be no reversal." In *Spahn* v. *People,* 137 Ill. 538, the court, referring to the argument of the State's attorney complained of, said (p. 547) : "While arguments of that character are not to be approved or looked upon with favor, still they will not ordinarily be deemed sufficient to necessitate a reversal of the judgment unless they are of such a character as to raise an inference that the jury were probably misled or improperly influenced thereby." In *Siebert* v. *People,* 143 Ill. 571, the court said (p. 591) : "It is impossible to lay down any general rule in regard to what shall or shall not be said in an argument to the jury, but unless it is apparent that defendants have been injured by improper remarks the judgment should not be reversed on that ground alone." In *Ochs* v. *People,* 124 Ill. 399, it is said (p. 430) : "The course of the People's counsel on the trial was not free from censure. There was a harshness of bearing and intemperance of language toward the defendants which it is not pleasant to witness in a record and which should never be assumed and indulged in against a prisoner on trial. There may, perhaps, be somewhat of extenuation in the circumstances of the case. Defendant's counsel themselves were not faultless in their own bearing." In *North Chicago Street Railway Co.* v. *Cotton,* 140 Ill. 486, the court said that while in clear cases it would reverse, and frequently had reversed, judgments on account of improper remarks to the jury, this was always done with hesitation and reluctance.

It will be seen from the cases referred to, that while improper remarks of counsel in argument to the jury. have uniformly been condemned by this court, judgments have been reversed on account of such remarks only in cases where the evidence for the prosecution was of such character that the court was of opinion the improper remarks contributed to produce the verdict of the jury. The court sustained objections by counsel for plaintiff in error to the argument of the State's attorney, and instructed counsel for both sides, in the presence of the jury, that they must not argue matters not in evidence. The jury were also instructed that it was not proper for counsel to state anything in argument upon his personal knowledge or which might have been told to him by others who were not witnesses, and to disregard any such statements and base their verdict upon the evidence, giving no consideration to statements of counsel not supported by the evidence. Observing the rule which has uniformly been followed by this court, we would not be justified in reversing the judgment on account of the improper argument of counsel for the People complained of by plaintiff in error.

We find no error in this record that requires or justifies a reversal of the judgment of the criminal court, and it is therefore affirmed.          *Judgment affirmed.*

Mr. JUSTICE COOKE, dissenting:

In my opinion this judgment should be reversed on account of the improper and highly intemperate remarks of the State's attorney in his closing argument to the jury. Plaintiff in error attempted to show in his defense that he was doing everything in his power to control and discourage the vice and prostitution prevalent in his district, and that as a result of his activities along that line certain of the denizens of the district had conspired to discredit and ruin him. The State relied for its conviction chiefly upon the testimony of the two Franks, who were admitted to be

interested in the conduct of two houses of prostitution,—
a disreputable and illegitimate business. Anything that
tended to contradict either of them in any material matter
was of importance to the defense. The testimony of the
witness Boyer that Louis Frank said to him in the early
part of the year 1909, "Business is very poor; the admin-
istration isn't letting up any," contradicted the testimony of
Frank, and, if true, tended strongly to corroborate the claim
of the defense that plaintiff in error was attempting to rig-
idly control the illegitimate business in which the Franks
and others were engaged in that district. Plaintiff in error
was entitled to have this testimony go to the jury without
any improper attack being made upon it. If Boyer was not
a credible witness, there are well defined rules, with which
the State's attorney must have been familiar, governing the
methods by which he might have been impeached. The
State's attorney did not see fit to avail himself of any
proper method of impeachment. When Boyer was first on
the stand his cross-examination was waived. The next day
he was recalled for cross-examination. That examination
was as follows:

Q. "Were you not convicted in the Philippine army, as
a member of the regular army, for embezzlement?

A. "No, sir.

Q. "Were you not sentenced to dismissal and one year's
confinement, and it was held illegal because the court was
composed partly of regular officers? (To this question ob-
jection was interposed on the part of defendant.)

The court: "Objection sustained. The only proof is to
be made by record.

Mr. Wayman: "Unless he would admit it.

The court: "And he denies it."

No attempt was thereafter made by the prosecution to
show that Boyer had been convicted of any crime that
would affect his credibility, and the State's attorney seeks
to justify his use of the language quoted in the majority

opinion, and his offer to read to the jury the alleged tele-
gram from the war department at Washington, on the
ground that one of the counsel for plaintiff in error in his
argument stated to the jury, referring to this cross-examin-
ation of Boyer: "If that was true, why not prove it? Why
make that assault on the man? Boyer was not a man con-
victed as an embezzler, yet he was able to assault him un-
justly." Whether there could be any justification for the
statement of the State's attorney, it cannot be said that un-
der the circumstances there was anything improper in the
argument of counsel for plaintiff in error on this point.

In addition to the other instances cited in the majority
opinion, the State's attorney, on a number of occasions,
traveled outside the record in his argument to the jury.
His statements on these occasions were not in reference to
matters so material as those pointed out, but they were all
calculated to improperly influence and prejudice the jury,
and no doubt had that effect. In referring to a character
witness called on the part of plaintiff in error, he stated that
the chief thing in his career was that he had beaten a lawyer
up so that he died in an insane asylum. Of Rev. E. A. Bell,
another character witness, he stated: "My only connection
with Mr. Bell, and my only introduction to him, was when
he interceded with all his might to save from the gallows
a dirty burglar who had shot down a police officer in the
middle of the night, and I would not stand for it. * * *
I stood by the police force at that time and Bell did not.
Don't tell me Bell knows more about this case than I do."
Again, in attempting to bolster up the reputation of Frank,
who owned two houses of prostitution, he stated that there
was not an estate in Cook county that did not own houses
used for the purpose of prostitution, and named the estate
of one prominent citizen of Chicago as being among the
number. These statements were all objected to and the ob-
jections sustained, but the jury heard the statements made
and these rulings of the court could not have the effect of

removing from the minds of the jurors the impressions created by hearing the statements made. Some of these remarks were of such.a character and were concerning matters so material, and were calculated to so influence the jury, that it is impossible to say they produced no effect or that the verdict of the jury would have been the same had they not been made. This is particularly true of the Boyer incident and of the attack made on the record of plaintiff in error as a member of the police force, which is set out in the majority opinion. If the jury believed the testimony of the Franks it was inevitable that they must find the plaintiff in error guilty. On the other hand, if they did not believe their testimony it is very improbable that a verdict of guilty would have been returned. Anything bearing upon the credibility of either of these witnesses was a material matter and plaintiff in error had the right to have it properly presented to the jury.

In my opinion the misconduct of the State's attorney was so gross and so prejudicial in its tendency that it is impossible for this court to say that the jury were not influenced by it. We have not hesitated, in civil cases, to reverse a judgment on account of impressions wrongfully conveyed to the jury's mind by improper conduct of counsel. (*Chicago City Railway Co.* v. *Gregory*, 221 Ill. 591; *McCarthy* v. *Spring Valley Coal Co.* 232 id. 473.) The rule in this regard should be more strict in criminal cases than it is in civil cases. In *McKevitt* v. *People*, 208 Ill. 460, we said concerning similar conduct (p. 468) : "The prosecuting attorney, who thus violated a fundamental rule of practice, should not be permitted to sustain a verdict if his conduct has contributed to the conviction of the defendant." And in the earlier case of *Raggio* v. *People*, 135 Ill. 533, in discussing the same subject, we said (p. 545) : "The trial court erred in overruling defendant's objections to these statements, and while a court of review will always hesitate to set aside a conviction for such error alone, yet in a case

like this, where there is much reason to fear that the verdict was not the result of a dispassionate consideration of all the evidence in the case, it becomes material and substantial error." In this case there is reason to fear that the verdict was not the result of a dispassionate consideration of the evidence, and as was said in the *McKevitt case, supra,* the prosecuting attorney should not be permitted to sustain this verdict if his conduct has contributed to the conviction. I have not attempted to set out all of the remarks of the prosecuting attorney that were objectionable, but for the reasons given above this judgment should, in my opinion, be reversed.