THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Er- ror, *vs.* JAMES H. THOMAS *et al.* Plaintiffs in Error.

*Opinion filed April 20, 1916.*

1. CRIMINAL LAW—*party not objecting to admission of alleged dying declaration cannot complain.* Defendants in a murder trial are not entitled to complain, on appeal, of the admission in evi- dence of an alleged dying declaration where no objection was made to its admission.

2. SAME—*when alleged dying declaration is properly admitted.* The alleged dying declaration of the victim of an affray is prop- erly admitted in evidence where it was taken down and transcribed by a stenographer, who testifies that the statement was correctly transcribed as given by the declarant, who was in great pain, and who said, at the time, that he knew he was going to die.

3. SAME—*when conviction for murder cannot be sustained.* A conviction for murder will not be sustained where the preponder- ance of the evidence shows that the defendants were the president of the village, police officers and persons regularly called upon to assist the police officers, who were attempting in a lawful manner to serve a warrant upon and arrest a violator of the law, and that the decedent was killed while he was aiding the offender in resist- ing arrest.

4. SAME—*when it is the duty of the court to reverse the judgment of conviction.* While, generally, the verdict of the jury in a criminal case, on conflicting evidence, will not be disturbed by a court of review on the facts, yet if it appears the evidence was insufficient to warrant the belief of the defendant's guilt beyond a reasonable doubt and that the jury must have been under a misapprehension or misconceived the evidence, it is the duty of such court to reverse the judgment of conviction.

5. SAME—*jury should be fully instructed as to rights of defendant as an officer of the law.* On the trial of the president of a village board for murder in causing the death of a person who was assisting a violator of the law to resist a lawful arrest attempted to be made by the president of the board and police officers appointed by him, it is important that the jury be fully instructed as to the right and duty of the defendant to keep the peace and enforce the law, and if it is claimed his election was invalid the instructions should cover his rights and duties both as a *de jure* and a *de facto* officer.

WRIT OF ERROR to the Circuit Court of St. Clair county; the Hon. LOUIS BERNREUTER, Judge, presiding.

F. J. TECKLENBURG, E. L. MAHER, and H. J. BANDY, for plaintiffs in error.

P. J. LUCEY, Attorney General, CHARLES WEBB, State's Attorney, and GEORGE P. RAMSEY, (W. L. COLEY, of counsel,) for the People.

Mr. JUSTICE CRAIG delivered the opinion of the court:

The plaintiffs in error, James H. Thomas, Sr., Anthony Speed, George Campbell, George Rowe, Joseph H. Doss and Emmett Dorman, together with Oscar Bletson, William McCoy and George Parks, were indicted and tried in the circuit court of St. Clair county for the murder of Robert Jackson. The plaintiffs in error were convicted and found guilty of murder and their sentence fixed at fourteen years in the penitentiary, and they have sued out a writ of error to have such judgment reviewed. Bletson, McCoy and Parks were acquitted on the trial.

The indictment contained five counts, each charging the plaintiffs in error with the murder of Robert Jackson on May 7, 1915, in Brooklyn, St. Clair county, Illinois, by shooting. The first count of the indictment charges plaintiffs in error agreed and conspired together to kill the said Robert Jackson, and that they carried out such conspiracy by killing him. The fifth count of the indictment charges plaintiffs in error agreed and conspired together to kill one Lemuel G. Costly, and that the attempted carrying out of such plan resulted in the death of said Robert Jackson.

Brooklyn, St. Clair county, is a negro village, and all the parties whose names are mentioned as connected with the transactions and circumstances culminating in the killing are negroes. Plaintiff in error James H. Thomas, Sr., as candidate on the progressive ticket, was elected president of the board of trustees of the village of Brooklyn, St. Clair county, April 20, 1915, defeating one Evans, the candidate on the people's ticket, and as successor to R. J. Cole, then president of the board of trustees. On April 23, 1915, Thomas received his certificate of election from the village clerk as such newly elected officer. May 5, 1915, Thomas and the newly elected trustees of said village were arrested on a warrant sworn to by L. G. Costly, charging election frauds, and taken to East St. Louis, where they gave bonds. They returned to Brooklyn the same evening and went to the town hall to hold a meeting of the village board. Here they found the outgoing president and members of the board of trustees in possession of the council room, which they refused to relinquish. The party then went to another room in the town hall building, where they held a meeting, and plaintiff in error Anthony Speed was appointed chief of police, Oscar Bletson night policeman, Louis Perryman police officer and the plaintiff in error Joseph Doss special policeman. The meeting was adjourned to May 7, 1915, and the appointees were instructed to file their bonds and qualify. The outgoing officials refused to vacate their re-

spective offices or turn over the books of the village to the newly elected ófficers, and on the night of May 5, 1915, the outgoing president of the board of trustees, Cole, instructed Costly to remain in the council room and guard the village books there in the safe. Plaintiff in error Thomas thereupon instructed appointee Perryman to remain in the town hall and watch Costly. On May 6 Cole, after his term of office had expired and he had no right to do so, issued a commission to Costly as village marshal. On May 7, 1915, Costly swore out a warrant in East St. Louis charging the plaintiffs in error Speed and Doss, and Bletson and Perryman, with falsely assuming to be officers. They were arrested and taken to East St. Louis in the afternoon, where they gave bond and returned to Brooklyn about seven o'clock that evening. During the time they were in East St. Louis under arrest it appears Costly assumed to act as village marshal of Brooklyn by virtue of the commission issued to him by Cole on May 6. Costly also assumed the authority to deputize Robert Jackson, who was fatally wounded in the subsequent riot, as a policeman, and in company with Jackson and others paraded the streets hurrahing for the people's party, to which they belonged, and shouting, "Who is chief of police?" or "See who is chief of police now!" and otherwise acted in a riotous and tumultuous manner, and there was much fighting and disorder. Costly made an arrest and demanded and secured the keys to the jail from the wife of the plaintiff in error Speed during the absence of the latter in East St. Louis under arrest on the warrant sworn out by Costly. Plaintiff in error Thomas, shortly after he quit work at six o'clock on the evening of May 7, 1915, heard of the arrest of the police officers and of the arrest made by Costly. He also saw Costly assuming to act as chief of police and noticed the disorder and rioting in the streets and telephoned the sheriff of the county at Belleville. He was not allowed, on the trial, to relate his conversation with the sheriff or what directions or advice

272 — 36

the latter gave him, if any, but after communicating with the sheriff, and pursuant to such communication, he went before a justice of the peace and swore to a complaint and procured a warrant charging Costly with impersonating an officer. He deputized George Parks to serve the warrant and delivered it to him, but Parks soon returned it to Thomas unserved, with the explanation that Costly was surrounded by friends and he feared to make the arrest. About seven o'clock in the evening, when the arrested officers returned to Brooklyn from East St. Louis, plaintiff in error Doss went to a doctor's office at the corner of Fifth and Madison streets, while Speed, Bletson and Perryman went to the town hall. There they met Thomas and the village attorney and a conference was had, after which Thomas gave the warrant for the arrest of Costly to plaintiff in error Speed, who, together with officers Bletson and Perryman, and plaintiffs in error Rowe and Campbell and defendant McCoy, who were called upon to assist the regular policemen, went to make the arrest. They met plaintiff in error Dorman, a Thomas appointee, who joined them, and in a body they proceeded east on Madison street, past the corner of Fourth and Madison streets, and met Costly, Robert Jackson, Henry Gaston and Napoleon West. West claimed to have been commissioned as a policeman by Cole, the ex-president of the village board, on May 6, after his term of office had expired, and that he was handed the commission by Costly a few minutes before, or about 7:30 in the evening. Gaston was an ex-convict and had served one term in the penitentiary for murder and another for robbery. He had been deputized orally and given a revolver by Costly. Bletson had the warrant for the arrest of Costly, and upon his attempting to serve the same on Costly the shooting commenced and in all about fifty shots were fired. Costly, Jackson, Speed, Dorman and Campbell were injured and Perryman was instantly killed. Jackson died a few days later from the effects of his wounds. On the trial

Costly and West admitted that they were armed and took part in the shooting, and there was ample evidence that Gaston was also armed and participated, although he claimed that he had returned the revolver to Costly because he did not have a written commission as policeman.

There is much conflict in the testimony as to who fired the first shot, the State contending it was Speed and defendants claiming it was Costly. The State also claims that while plaintiff in error Doss was not with the party that left the town hall with the warrant for the arrest of Costly and was not with them when they attempted to serve the warrant and when the shooting commenced, yet he joined it later and fired the shots which killed both Perryman and Jackson. Doss, and several witnesses apparently reliable and disinterested, testified he was during all this time at a doctor's office at the corner of Fifth and Madison streets and did not leave there until after the shooting.

The grounds upon which a reversal of this judgment is asked are (1) the insufficiency of the evidence to convict; (2) error of the court in the admission and rejection of evidence; (3) the trial of plaintiff in error Doss with the other plaintiffs in error, when the proof showed he was not with them and knew nothing of their intentions, and that whatever he did was his individual act and not done in concert with the other plaintiffs in error; (4) error of the court in giving and refusing instructions.

The proof shows Costly caused the arrest of Thomas and the men who ran on the ticket with him for trustees, on May 5, the day they were to take office and two weeks after the election, on a charge that they had been guilty of election frauds. Three of the policemen arrested on the warrant sworn to by Costly on May 7, plaintiff in error Speed and Bletson and Perryman, were already policemen of the village at the time of their appointment by Thomas, having been appointed under previous administrations and had served from one to four years. In their absence Costly

put on a star and assumed the office of village marshal. He made at least one arrest and by his boisterous conduct excited considerable disorder and disturbance of the peace. He demanded the keys of the village jail from the wife of Speed in the absence of the latter and required her to deliver them up to him. The only basis for his claim to exercise such authority was an alleged appointment by Cole, who claimed to have legal advice to hold office until the trouble about the election had been settled. No proceeding had been begun to contest the election of Thomas or to prevent him from assuming the duties of the office. The only trouble about his doing so was made by Costly, who caused his arrest charging him with election frauds, (which charge never came to trial,) and the conduct of Cole in assuming to hold and exercise the duties of the office after his term had expired. There was no warrant or justification whatever for his doing that. Thomas, himself, procured the issuance of the warrant for the arrest of Costly for impersonating an officer, and it cannot be said that he acted without probable and reasonable cause. He was president of the village board and an officer of the law. It was his duty to see that the law was observed and the peace kept in the village. He had communicated with the sheriff of the county and had advised with counsel, and it is very clear from the evidence that he acted with great forbearance and entirely from a desire to enforce the law and prevent rioting and fighting in the village. He would have been liable for misfeasance in office had he done otherwise than he did. He had a right to summon other citizens to assist in enforcing the law and keeping the peace. The warrant was first delivered to Parks, whom Thomas deputized to execute it. Parks did not do so because of fear of Costly and his friends and returned the warrant to Thomas. After the return of Speed, Bletson, Perryman and Doss from East St. Louis, where they had been taken by an officer, the first named three went to the town hall, where they met Thomas, and

the warrant for Costly's arrest was given Speed to execute. It is apparent they feared Costly, and four others beside the men Thomas had appointed policemen were requested to accompany the police to make the arrest. Bletson suggested that the warrant be given him, as he and Costly belonged to the same lodge, and said he thought Costly would not resist if he served the warrant. It was accordingly given to him. The regular policemen and the others summoned by Thomas as president of the village board started with the warrant to make the arrest. Bletson told Costly he had a warrant for his arrest. It was about eight o'clock in the evening and the street lights had not been turned on. Costly proposed they step out in the street where the light was better, and they did so. From that time on the testimony is in conflict. According to the testimony of plaintiffs in error and numerous witnesses, Costly immediately after stepping into the street declared "no warrant goes," or used words to that effect, and further declared that he would not be arrested and drew a revolver from his coat pocket and shot Speed, who fell to the sidewalk. Gaston fired several times at Speed after he was down. Speed was shot four times. The shooting immediately became general, from thirty to fifty shots being fired. According to the testimony of the Costly party and of others, as soon as Costly and Bletson stepped into the street Speed shot Costly, who fell and then drew his gun and returned the fire, the engagement between the respective forces at once becoming general. When the battle was over, Perryman, of the Speed party, was dead, and Robert Jackson, of the Costly party, mortally wounded. Speed, Costly and some others who were wounded, recovered. According to the testimony of the plaintiffs in error, Jackson stood by and encouraged Costly to resist arrest and took an active part in the shooting, and such was undoubtedly the fact. According to the testimony of the Costly party, Perryman was killed by Doss, one of his own party. Speed was armed with a winchester rifle, which he procured

from his home before starting to make the arrest and carried it over his arm. The witnesses for the State all testified that he started the shooting and fired the first shot from his rifle. He testified in his own behalf that he never fired the rifle, and in this he is corroborated by Bletson, who was acquitted, who testified that after the riot, when the guns were taken from the participants, a cartridge was found to be jammed in the rifle and which they were unable to extract. A bystander, Peyton Anderson, who witnessed the affair and who does not seem to have been identified with either faction, also testified that Speed attempted to use his rifle but it would not work. Logan P. Miller, the sheriff of St. Clair county, who arrived on the scene about an hour after the riot and proceeded with his deputies to disarm and arrest the participants, examined Speed's rifle. He testified on the trial that there was no smell of powder about the rifle and in his judgment it had not been discharged that night, and also that it had not been recently cleaned, because of the gray color around the muzzle of the barrel.

The dying declaration of Robert Jackson was taken by a stenographer and transcribed by her in typewriting. She testified it was correctly transcribed as given by Jackson, who said at the time he knew he was going to die and who was suffering great pain. Its introduction in evidence was not objected to, and the complaint that it was improperly admitted cannot be reviewed. (*People* v. *Lutzow,* 240 Ill. 612; *People* v. *Anderson,* 239 id. 168.) In any event, we are of opinion an objection to its introduction would have been unavailing. *People* v. *Warren,* 259 Ill. 213.

It is certain there was much false testimony given, and some of it bears inherent evidence of being false. Some of the witnesses on both sides had served sentences in the penitentiary and some in jail, and some of the witnesses were under sentence at the time of the trial for other crimes and were brought from jail to testify. Generally speaking, the jury are better able to judge of the weight and credit to be

given the testimony of the witnesses than this court, but in the case at bar the evidence greatly preponderates that plaintiffs in error were attempting to serve a warrant and make a lawful arrest in a lawful manner and that the death of Jackson was caused by his aiding Costly to resist arrest. There is no question but that the warrant for the arrest of Costly was properly procured and issued and placed in the hands of a proper officer to serve. This officer, Bletson, and two other of the defendants, as has been noted, were regular police officers of the village, acting under commissions issued by former authorities and re-appointed by Thomas and commissioned by him. The others had all been regularly called upon to assist in making the arrest. The evidence that plaintiff in error Thomas took any part in the shooting was very slight. The overwhelming weight of it was that he did not and that he was unarmed. The fact that he caused the warrant to issue for the arrest of Costly and accompanied the officers when they went to make the arrest is not, of itself, sufficient to make him guilty of murder.

Two of the counts of the indictment charge a conspiracy among the defendants to commit murder, and it is argued these counts were sustained by the proof. The basis for this contention is, that when the four policemen alighted from the car on which they returned from East St. Louis they were met by Andrew Jackson and told to hurry to the town hall,—that Thomas wanted to see them,—and that all of them but Doss immediately went to the hall. All of the defendants denied there was any agreement or conspiracy to kill Costly or Robert Jackson, and testified the only instructions to and purpose of the Speed party was to arrest Costly, disarm him and remove his star. The purpose in calling others to assist, as stated by Thomas, was that there would be less liability of resistance in such case. Also, there was testimony that as Thomas was passing along the street by himself some time before the shooting occurred, and, as we understand it, before the policemen re-

turned from East St. Louis, he said to a man called "Mixer" Price he would show him how to mix it in ten or fifteen minutes, or words to that effect. The proof shows that after Thomas quit work at six o'clock and came up-town there was much disorder and some fighting in the streets, and Costly was mixed up in it. He saw Costly with a star on, conducting himself in a turbulent manner. He was informed, also, of the arrest, at Costly's instigation, of the men he had appointed on the police force. He then went to a magistrate, procured a warrant for Costly's arrest for falsely assuming to be an officer and gave the warrant to Parks, whom he deputized to serve it. This was before the men he had appointed policemen had returned from East St. Louis. Parks went to serve the warrant but found Costly in the company of a number of his friends and was afraid to try to arrest him. He returned the warrant to Thomas with that explanation, and after the return of the policemen from East St. Louis, Thomas gave them the same warrant to serve. It must have been apparent to anyone who respected law and good order that there was need someone should be arrested, and we are convinced no one needed. it more than Costly. No possible criminal motive can be inferred from the act of Thomas in procuring a warrant and ordering the arrest of Costly or in sending for the village police and consulting with them. Costly was not an officer, and, while wearing a star and proclaiming himself an officer, he was conducting himself as a disturber of the peace and a violator of the law. There is no evidence authorizing any inference that at the time the warrant was issued, or at any time after it was issued, it was part of a scheme to kill Costly or anyone else.

We are of the opinion the conviction of plaintiffs in error was not warranted by the evidence. If the evidence showed that the homicide in question had occurred in a conflict between two factions indulging in a private quarrel it would be an entirely different matter. In such case there

would have been no excuse for plaintiffs in error to arm themselves and seek a fight, with its probable consequences. Certain of the plaintiffs in error were officers of the law attempting to serve a warrant and others had been duly summoned to assist them in serving the warrant and making the arrest. They all had good reason to believe, and evidently did believe, that they were dealing with armed and desperate characters. It was an unfortunate and disgraceful affray, but it cannot be said but that it was brought about by Costly and his accomplices, and we think the killing of Jackson resulted from his aiding and abetting Costly in defying the law and resisting arrest. While, generally, the verdict of a jury in a criminal case on conflicting evidence will not be disturbed by a reviewing court, yet where it appears the testimony was insufficient to warrant the belief of a defendant's guilt beyond a reasonable doubt and that the jury must have been under a misapprehension or misconceived the evidence in finding him guilty, it is the duty of a reviewing court to reverse a judgment of conviction. *People* v. *McCann,* 247 Ill. 130; *People* v. *Conners,* 246 id. 9; *Dahlberg* v. *People,* 225 id. 485; *Keller* v. *People,* 204 id. 604.

The court permitted a witness, over objection of counsel for the plaintiffs in error, to state that an attorney had advised Cole, the outgoing president of the village board, to hold possession of the village offices and records until the matter was decided by law. Inasmuch as no contest had been started or other legal proceedings instituted to test the right of Thomas to the office to which he had been declared elected, we think it was error, although not a very serious one, to permit this evidence to be introduced.

An instruction offered in behalf of the defendants instructing the jury, in effect, that if they believed, from the evidence, that plaintiff in error Thomas was elected president of the board of trustees of the village of Brooklyn and qualified, then he was entitled to possess said office with au-

thority to execute the duties of such office according to law and the ordinances, was refused, apparently on the ground that it was covered by another instruction. We think the plaintiffs in error were entitled to this instruction.

Another refused instruction was as to the rights of Thomas if he had assumed the office without being legally elected and his rights as a *de facto* as distinguished from a *de jure* officer. Thomas claimed to be acting as the lawful president of the village board, and he justified whatever actions he took in the premises by reason of his authority as such officer. It was important that the jury should have been fully instructed on that point. We do not think it was covered by any other instruction, and it should have been given.

Instruction No. 11 for the People, which is complained of, was to the effect that if the jury believed, from the evidence, beyond a reasonable doubt, that the defendants killed Robert Jackson with malice aforethought, as charged in the indictment, and that such killing was done without the necessity therefor being so apparent as to induce the belief in a reasonable mind that it was necessary for the defendants to take the life of the deceased, they were not justified in killing the deceased. We do not think the instruction is faulty for the reasons given by counsel for plaintiffs in error. Sections 148 and 149 of the Criminal Code define justifiable homicide and necessary self-defense. This element did not enter into the case as much as the matters set out in section 150 of the Criminal Code, which provides when an officer is justified in killing an assailant if resisted and assaulted when serving legal process. No instruction was given on this point.

For the reasons given the judgment of the circuit court will be reversed and the cause remanded to that court for a new trial.                    *Reversed and remanded.*